UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH R. ROMERO,<br>       Plaintiff,<br>   v.<br>JOE McGRAW, et. al.,<br>       Defendants.<br>_____ / | No. C 04-4000 SI (PR)<br><br>**ORDER GRANTING MOTION<br>FOR SUMMARY JUDGMENT** |

## INTRODUCTION

Joseph R. Romero, an inmate currently housed at High Desert State Prison, filed this pro se civil rights action under 42 U.S.C. § 1983. Defendants now move for summary judgment, arguing that they are entitled to judgment as a matter of law on Romero's Eighth Amendment claims and on the defense of qualified immunity. For the reasons discussed below, the court grants defendants' motion.

## BACKGROUND

The amended complaint alleges claims for deliberate indifference to Romero's safety and medical needs. Romero claims that prison officials knew his cellmate posed a danger to Romero but failed to move Romero out of the cell, and Romero was thereafter attacked by his cellmate. He further claims that two prison doctors denied his requests for medical treatment when he complained that he could feel bones moving in his jaw area and that the bones were breaking through the inside of his mouth.

The following facts are undisputed unless otherwise noted:

1

A.     Romero's Injury

Romero was transferred from Salinas Valley State Prison to Pelican Bay State Prison on September 10, 2003. Inmate Puerto also was transferred to Pelican Bay at the same time.

Upon arrival at Pelican Bay, Romero was put in a holding cell with Puerto and several other inmates. During the receiving process, the receiving and release ("R&R") officer told Romero he would be housed with Puerto. Romero informed the R&R officer that he was "classified as a non-affiliated inmate and could not be housed with Puerto because Puerto is an affiliated Southern Hispanic." Amended Complaint, ¶ 26.

An initial review hearing was held for Romero by the Unit Classification Committee ("UCC") on September 18, 2003. Defendants Trujillo, Lucarelli, and Wheeler were on the committee. The parties disagree as to what was said at the hearing. Defendants deny that Romero identified Puerto as presenting a danger to him or that Romero expressed any safety concerns. Romero, on the other hand, states that he informed the committee that he was "classified as a non-affiliated inmate and feared for his safety, and could not be housed with inmates who are gang affiliated or are part of any prison faction, or disruptive groups." Amended Complaint, ¶ 29. Romero does not state that he told the committee that Puerto was in a gang or that Puerto in particular posed a danger to him. Romero states that defendant Wheeler refused to confirm his status as a non-affiliated inmate and said there was "no such thing" as a non-affiliated inmate at Pelican Bay. Id. at 33. Romero also states that defendant Lucarelli stated that he didn't know why Romero "doesn't want to cell-up with this guy (Puerto), they are within 20-pounds of each other, that would make a good match." Amended Complaint, ¶ 38. Romero interpreted "match" to mean a fighting match because he "knows from his prison experience, that even prison officials can have certain hostilities toward sex offenders," and Puerto was a sex offender. Id. at ¶ 39.

The CDC-128G form prepared after the hearing did not indicate that Romero expressed a safety concern during the hearing. That CDC-128G stated that Romero "agrees with his current double cell assignment and states he can be housed with non-affiliated Hispanic ethnic

2

1   groups." Trujillo Decl., Exh. A.[1]

2   Romero alleges in his amended complaint that Puerto was a sex offender who had been
3   moved to Pelican Bay because he had been attacked by his fellow gang members after they
4   discovered he was a registered sex offender. Amended Complaint, ¶ 21. Romero also alleges
5   that Puerto had "safety and security concerns noted in his central file and was supposed to be
6   single-celled," and had an "R" suffix,[2] although Romero does not show that he had personal
7   knowledge of the contents of Puerto's central file. Id. Romero further alleges that unidentified
8   prison officials were aware of Puerto's propensity for violence against other inmates. Amended
9   Complaint, ¶ 22.

10   According to Puerto's central file, he has never been validated as an associate or member
11   of a prison gang. His records also indicate he was cleared for double-cell housing while at
12   Salinas Valley and at the time of his transfer to Pelican Bay. Puerto had been on single-cell
13   status for two brief periods in 2001, but otherwise had been cleared for double-cell housing since
14   his return to prison in 1999.

15   Romero was attacked by Puerto in their cell on the night of September 19 or 20, 2003.

17   B.   The Medical Care

18   Romero was taken to the prison infirmary later in the evening after he was hurt. The next
19   morning, Romero was taken to the Sutter Coast Hospital emergency room, where he reported
20   (as he had at the prison infirmary) that he fell on his head as he attempted to get down from his
21   bunk bed and complained of pain on the right and left jaw. See Allen Decl., Exhs. A and B. At
22   the hospital, a CT scan and x-rays were done. The radiologist's report of the CT scan stated that

---

[1] Defendant Trujillo explained that, if an inmate expresses safety concerns at a UCC hearing, he will normally be placed in a holding cell after the hearing until he can be interviewed by a correctional counselor to assess the problem. "Emergency cell moves are not appropriate in the absence of some specific information concerning a risk to the inmate. There would be substantial disruption to the orderly operation of the prison if staff were required to rehouse an inmate each time he expresses generalized anxiety about prison life or vague fears about the other inmates." Trujillo Decl., ¶ 2.

[2] An "R" suffix is used in the classification process to indicate that the inmate is a sex offender. See Cal. Code Regs. § 3377.1(b).

3

there was a "nondisplaced fracture of the right body of the mandible at the angle of the jaw." Allen Decl., Exh. B, p. 3. The CT scan report did not indicate any problem on the left side of the head. The emergency room doctor interpreted the x-rays he had ordered: "X-rays of the mandible were interpreted by me as showing a linear fracture through the right angle of the mandible. I can find no fracture on the left." Allen Decl., Exh. B, p. 2. The emergency room record also states that the emergency room doctor discussed the case by telephone with Dr. Allen at the prison, and returned Romero to the prison infirmary after giving him pain medication. Id.

On September 22, 2003, Dr. Johns recommended Romero for an urgent outpatient consultation with Dr. John Biteman.[3] Dr. Biteman saw Romero on September 24, 2003. Dr. Biteman's post-consultation letter to the prison clinicians noted that the x-rays showed a nondisplaced right side fracture and that Romero had mentioned that "it feels like the lower teeth on the left are loose." Allen Decl., Exh. D. Dr. Biteman wrote: "It is reasonable to treat this initially with just a pureed diet, Vicodin regularly for pain, and prophylactic amoxicillin 500 mg, three times a day for 20 days. If, by three weeks out from the injury, his pain is not starting to lessen and the occlusion of his teeth remains off to a significant degree, then it would be appropriate to reassess him in the office to determine if closed reduction, intermaxillary fixation with arch bars and rubber bands may be indicated." Id. Dr. Biteman indicated that it would be appropriate to see the patient sooner if the pain worsened. Id. Dr. Biteman's written report for the September 24 visit did not mention any need for further x-rays, although Romero alleges that Dr. Biteman told him that "he needed further x-rays from the medical and/or dental department at P.B.S.P. in order to assess plaintiff's complaints about the left side injuries." Amended Complaint, ¶ 50.

Romero states that he made "numerous complaints" to Dr. Allen and Dr. Johns and the nursing staff on unidentified dates "that he could feel the bones moving on the left side of his jaw, that the bones were beginning to break through the inside of his mouth and causing severe pain, numbness, twitching and spasms in the facial areas, and that Dr. Biteman had requested

---

[3]Dr. Biteman practiced in Arcata, California. His stationery listed him as a board-certified M.D. with specialties including head and neck surgery and facial plastic surgery.

4

additional x-rays." Amended Complaint, ¶ 51. He further alleges that Dr. Allen and Dr. Johns refused to take any additional x-rays.

At some date after Romero first saw Dr. Biteman, additional x-rays were taken and the <u>dental</u> staff at Pelican Bay discovered a separate non-displaced fracture on the left side of Romero's jaw. Romero was taken back to Dr. Biteman on October 8, 2006. Dr. Biteman's report for the October 8 visit noted that Romero was missing many teeth before the incident and that his dental plate had been broken in the incident -- factors that would affect the repair work to be done. Dr. Biteman's report stated that Romero's "original plain films did not show the left anterior body parasymphyseal fracture to any degree. Yet on the Panorex, it does show up as being nondisplaced as well." Allen Decl., Exh. E; <u>see also</u> Exh. F (again noting that the left side fracture didn't show up on original x-rays). Surgical repair was set for twelve days later, due to logistical problems transporting Romero to the hospital on a day Dr. Biteman was available.

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because all of the events or omissions giving rise to the claims occurred at Pelican Bay State Prison in Del Norte County, which is located in the Northern District. This court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. <u>See</u> 28 U.S.C. § 1331.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial...since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

5

Generally, as is the case with defendants' challenge to plaintiff's deliberate indifference claims, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted). Where, as is the situation with defendants' qualified immunity defense and with plaintiff's motion as to his deliberate indifference claims, the moving party bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. See Houghton v. Smith, 965 F.2d 1532, 1536 (9th Cir. 1992). He must establish the absence of a genuine issue of fact on each issue material to his affirmative defense. Id. at 1537; see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. When the movant has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Fed. R. Civ. P. 56(e), Schroeder v. McDonald, 55 F.3d 454, 460 & nn. 10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Romero's amended complaint was verified and therefore will be considered in opposition to the motion, even though he filed no opposition brief.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party. See id. at 631.

6

**DISCUSSION**

A.   Deliberate Indifference to Safety

The Eighth Amendment requires that prison officials take reasonable measures to guarantee the safety of prisoners. Farmer v. Brennan, 511 U.S. 825, 832 (1994). In particular, officials have a duty to protect inmates from violence at the hands of other inmates. Id. at 833. A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's safety. Id. at 834.

To be liable in a failure to prevent harm situation, the prison official must know of and disregard an excessive risk to inmate safety. Id. at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Id. He need not "believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before [he] is obligated to take steps to prevent such an assault." Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986). Before being required to take action he must, however, have more than a "mere suspicion" that an attack will occur. Id.; see, e.g., id. at 460 (summary judgment appropriate as to defendants when plaintiff "failed to come forward with any facts showing that these defendants had any reason to believe he would be attacked by the assailant").

When, as here, the prisoner seeks damages against a defendant, the "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988). Leer explained that "it is important to distinguish the causal connection required when a plaintiff seeks injunctive or declaratory relief as opposed to damages." Id. In the former case, a broader and more generalized approach to causation is taken. Id.

> When plaintiffs, such as the inmates, seek to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the eighth amendment deprivation must be more refined. We must focus on whether the individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference. In order to resolve this causation issue, we must take a very individualized approach which accounts for the duties, discretion,

7

>
> and means of each defendant…<u>Sweeping conclusory allegations will not suffice to prevent summary judgment</u>…The prisoner must set forth specific facts as to each individual defendant's deliberate indifference.

<u>Id.</u> at 633-34 (citations omitted) (emphasis added).

The key issue here is whether each defendant was aware of information regarding Romero's cellmate's violent tendencies or gang-related history. A defendant must be aware of the danger to be deliberately indifferent to it; it is not enough that a reasonable person should have known of the danger. Even accepting as true everything Romero alleges that he told the UCC, he has not shown a triable issue of fact that any defendant was aware of a danger posed by Puerto before Puerto attacked Romero.

Romero alleges that he told the R&R officer that he was "classified as a non-affiliated inmate and could not be housed with Puerto because Puerto is an affiliated southern Hispanic." Amended Complaint, ¶ 26. However, the R&R officer's awareness of a danger is not imputed to the other defendants and Romero offers no evidence that the R&R officer told any of the remaining defendants of Romero's concern about Puerto.[4]

Romero presents no evidence that he told the UCC members that Puerto was a danger to him. Romero's amended complaint states that he told the committee that he was not affiliated with any gang and could not therefore be housed with any gang member. That general statement is not enough to raise a triable issue of fact because there is no evidence that defendants knew that Puerto was in a gang and would attack Romero because of that gang membership. Romero also presents no evidence that he identified Puerto as a problem or a danger when he requested new housing before the UCC, and presents no evidence that he told the UCC about Puerto's reputation (e.g., that Puerto was in a gang, that Puerto attacked another cellmate, and that Puerto was supposed to be on single-cell status). Prison officials are not liable for dangers of which they are not aware. Thus, Romero's failure to present evidence that the defendants knew that Puerto posed a danger to him but ignored it is fatal to his claim.

---

[4] Although the R&R officer was originally named as a Doe defendant, he was dismissed from the action when Romero was unable to provide the officer's name.

8

Romero's amended complaint is full of the "sweeping conclusory allegations" that the Leer court found insufficient to defeat a summary judgment motion. 844 F.2d at 634. He has not shown a triable issue of fact that the officials knew of and disregarded an excessive risk to his safety. "A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. Therefore, defendants are entitled to summary judgment on this claim.

B.      Deliberate Indifference to Medical Needs

A prisoner can establish that he was denied adequate medical care in violation of the Eighth Amendment only by showing that prison officials acted with (1) deliberate indifference to (2) serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). There is no doubt that Romero's injuries were serious, as he eventually required oral surgery. However, he offers no evidence to show deliberate indifference of the defendant-doctors, which is required for his claim to survive summary judgment.

Romero contends that defendants Allen and Johns, both doctors at Pelican Bay, violated his constitutional rights by ignoring his complaints of pain and requests for additional x-rays after he had been seen by Dr. Biteman on September 24. As with his first claim, however, Romero offers no evidence that Drs. Allen and Johns knew of and consciously disregarded an objectively serious condition. The evidence is undisputed that when Romero was first taken to Sutter Coast Hospital after he was injured, a CT scan was performed and the radiologist interpreted it to be negative for brain and head injuries except for a fracture on the right side of the mandible. The ER doctor at Sutter Coast Hospital read the x-rays to show that Romero had a linear, non-displaced fracture of the right side of his mandible, but no fracture on the left side. When Dr. Biteman examined Romero three days later, he also concluded that there was a right side fracture, but none on the left.

9

Romero asserts that Dr. Biteman told him he needed further x-rays from the medical and/or dental department at Pelican Bay. However, even if Dr. Biteman told Romero that he needed x-rays, there is no evidence that Dr. Biteman conveyed this request to defendants. Indeed, Dr. Biteman's written report made no request for further x-rays even though he gave other specific orders (e.g., the diet for the prisoner and the circumstances under which he was to be brought back to Dr. Biteman for further evaluation).

Even if Romero had told Dr. Johns and Dr. Allen that Dr. Biteman said he needed further x-rays, no reasonable jury could find deliberate indifference in their failure to order further x-rays under the circumstances. Those circumstances were that (1) Romero had complained of both left and right side pain to the ER doctor and to Dr. Biteman, (2) neither the ER doctor nor Dr. Biteman saw a left side fracture in the x-rays, (3) the hospital radiologist did not see any evidence of a left side fracture in the CT scan, and (4) Dr. Biteman's written report did not indicate a need for further x-rays. The undisputed evidence is that the right and left sides had been x-rayed and that the doctors looked for but saw no evidence of a left side fracture. Romero has presented no evidence that it is medically necessary or appropriate to take new x-rays when no fracture is visible on the first x-ray.

No evidence in the record proves or would support a reasonable inference that Dr. Johns or Dr. Allen acted with deliberate indifference to the left side fracture, as Romero has not shown they knew of and disregarded his injury. Neither the ER doctor, nor the hospital radiologist, nor Dr. Biteman identified a left side fracture from the first examinations and x-rays of Romero. The Pelican Bay medical staff relied on the assessments of independent physicians, who did not identify the left side fracture. Reliance on the evaluations of the outside hospital doctors and the surgeon in considering Romero's condition did not amount to deliberate indifference. Once the left side fracture was detected by the dental department with a Panorex x-ray, Romero was taken to the outside specialist, Dr. Biteman, for further treatment.

At most, defendants were negligent, but the Supreme Court has repeatedly held that neither negligence nor gross negligence will constitute deliberate indifference under the Eighth

Amendment. Farmer, 511 U.S. at 835-36 & n.4; see also Estelle, 429 U.S. at 106; Whitley v. Albers, 475 U.S. 312, 319 (1986).

Romero does not present any evidence that the defendants knew of his left side injury and consciously disregarded it. Therefore, defendants are entitled to summary judgment on Romero's claim that they were deliberately indifferent to a serious medical need in violation of his Eighth Amendment right to be free from cruel and unusual punishment.[5]

C.   Qualified Immunity

The defense of qualified immunity protects "government officials...from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

To determine whether an official is entitled to qualified immunity, the court must decide whether the facts alleged show the official's conduct violated a constitutional right; and, if so, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Saucier v. Katz, 533 U.S. 194, 201 (2001). The first prong is a threshold question; "if no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id.

Since the court has concluded that the undisputed evidence fails to show a violation of Romero's constitutional rights, there is no need to proceed to the second step of the Saucier analysis. Defendants are entitled to qualified immunity as a matter of law on both claims.

---

[5] Dr. Johns was never served with process because he was no longer employed by the CDC when service of process was attempted at Pelican Bay. The deficiencies in Romero's evidence are the same for Dr. Johns and Dr. Allen. Therefore the court will enter judgment in Dr. Johns' favor as well as in favor of the other defendants without stopping to wait for plaintiff to locate Dr. Johns so that process may be served on him before judgment is entered in his favor.

11

## CONCLUSION

For the foregoing reasons, defendants are entitled to judgment as a matter of law on the merits of Romero's Eighth Amendment claims as well as the defense of qualified immunity. Defendants' motion for summary judgment is GRANTED. (Docket # 19.) Judgment will be entered in defendants' favor and against plaintiff. The clerk shall close the file.

IT IS SO ORDERED.

Dated: July 17, 2006

_____
SUSAN ILLSTON
United States District Judge